Steven C. Vondran (SBN 232337)
steve@vondranlegal.com
LAW OFFICES OF STEVEN C. VONDRAN, P.C.
One Sansome Street, Suite 3500
San Francisco, California 94104
Telephone: (877) 276-5084

Attorneys for Defendant and Counterclaimant
ELITECOM TECHNOLOGIES CORPORATION

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NETGEAR, INC.,<br><br>Plaintiff and Counterdefendant,<br><br>v.<br><br>ELITECOM TECHNOLOGIES CORPORATION,<br><br>Defendant and Counterclaimant. | Case No. 5:26-cv-05417-SVK<br><br>**DEFENDANT ELITECOM TECHNOLOGIES CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS; DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Susan van Keulen<br>Complaint Filed: June 4, 2026 |

Defendant Elitecom Technologies Corporation ("Elitecom"), by and through its undersigned counsel, hereby answers the Complaint for Declaratory Relief (Dkt. 1) (the "Complaint") filed by Plaintiff NETGEAR, Inc. ("NETGEAR"), asserts its affirmative defenses, and alleges its

Counterclaims against NETGEAR, as follows.

## PRELIMINARY STATEMENT

This is a collection case that NETGEAR has dressed up as an intellectual property dispute. NETGEAR asks the Court to declare that it may keep "using, maintaining, distributing, and licensing" software Elitecom built for it, forever and for free. To get there, NETGEAR quotes one sentence of Section 1.3 of the parties' Phase 2 Statement of Work and omits the sentence immediately before it. That omitted sentence is the bargain: "Netgear shall pay Elitecom an annual project maintenance fee so long as Netgear is using this application. Netgear shall not terminate this project and stop paying the maintenance fee within five years from the GA release of this project."

NETGEAR negotiated that language, signed it, and paid under it every year from 2021 through 2025. It then sent a one-paragraph "termination" letter that the parties' Master Agreement does not authorize, moved maintenance of the software in-house so that it could keep selling the products that run it, and refused Elitecom's 2026 invoice. Ownership of the project source code and payment for continued use of the application are two separate promises that sit side by side in the same section of the same contract. NETGEAR may own the code; it still has to pay for so long as it uses the application. Elitecom asks the Court to enforce the contract as written.

## GENERAL RESPONSE

Pursuant to Federal Rule of Civil Procedure 8(b), Elitecom responds to the numbered paragraphs of the Complaint below. Except as expressly admitted, Elitecom denies each and every allegation of the Complaint, including any allegation contained in headings, subheadings, the unnumbered introductory paragraph, or the prayer for relief. Where Elitecom states that a document "speaks for itself," Elitecom refers the Court to the complete document for its true and full contents and denies any allegation inconsistent

with it. Where Elitecom admits that a document contains quoted language, Elitecom admits only that the language appears in the document and denies NETGEAR's characterization of it. Elitecom uses NETGEAR's headings solely for convenience and does not admit any matter stated in them.

## ANSWER

### Unnumbered Introductory Paragraph

The unnumbered introductory paragraph states NETGEAR's characterization of its pleading, to which no response is required. To the extent a response is required, Elitecom admits that NETGEAR purports to bring this action against Elitecom and denies that NETGEAR is entitled to any relief.

### Nature of This Action

1. Elitecom admits that NETGEAR purports to seek declaratory relief and that Section 1.3 of the Statement of Work titled "ProAV Embedded APP Project Phase 2" (the "Phase 2 SOW") contains the sentence "Netgear shall own all source code of this project and related Intellectual Property." Elitecom avers that the same Section 1.3 also provides: "Netgear shall pay Elitecom an annual project maintenance fee so long as Netgear is using this application. Netgear shall not terminate this project and stop paying the maintenance fee within five years from the GA release of this project." Elitecom denies that NETGEAR is entitled to the declarations described in subparts (a) through (c) of paragraph 1, and specifically denies that NETGEAR owes no continuing maintenance payments and denies that Elitecom has engaged in or threatened any unlawful interference with NETGEAR's customer or business relationships. Elitecom denies all remaining allegations of paragraph 1.

### Jurisdiction and Venue

2. Paragraph 2 states legal conclusions to which no response is required. To the extent a response is required, Elitecom does not contest that

this Court has subject-matter jurisdiction over this action. Elitecom denies that the work-made-for-hire doctrine governs any issue in this case and avers that the parties' dispute concerns the construction of contractual payment terms governed by California law. Except as expressly stated, Elitecom lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in this paragraph and, on that basis, denies them.

3. Paragraph 3 states legal conclusions to which no response is required. To the extent a response is required, Elitecom admits that it is a corporation organized under the laws of the People's Republic of China and is a citizen of a foreign state for purposes of 28 U.S.C. § 1332(a)(2), and admits that the amount in controversy exceeds $75,000, exclusive of interest and costs. As to NETGEAR's citizenship, Elitecom lacks knowledge or information sufficient to form a belief about the truth of those allegations and, on that basis, denies them. Elitecom denies all remaining allegations of paragraph 3.

4. Elitecom lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them. Elitecom admits only that the amount in controversy exceeds $75,000, exclusive of interest and costs, and avers that the sums NETGEAR owes Elitecom alone exceed that amount.

5. Paragraph 5 states legal conclusions to which no response is required. To the extent a response is required, Elitecom lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them. Elitecom further denies that NETGEAR is entitled to the declarations it seeks.

6. Paragraph 6 states legal conclusions to which no response is required. To the extent a response is required, Elitecom admits that it entered into the agreements described below with NETGEAR, a company

headquartered in California, and that it communicated with NETGEAR concerning NETGEAR's payment obligations under those agreements. For purposes of this action only, Elitecom does not contest personal jurisdiction. Elitecom denies that it threatened any improper interference with NETGEAR's business relationships and denies all remaining allegations of paragraph 6.

7. Paragraph 7 states legal conclusions to which no response is required. To the extent a response is required, Elitecom lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them. Elitecom does not contest venue in this District for purposes of this action.

**Parties**

8. Elitecom lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them.

9. Elitecom admits that it is a corporation organized under the laws of the People's Republic of China with its principal place of business at 999 Zhongshan West Road, Suite 313, Shanghai, China 200051. Elitecom denies all remaining allegations of paragraph 9.

**Facts Giving Rise to This Action**

10. Elitecom admits that NETGEAR, through Fanny Lu, its Vice President of CBU Engineering, signed the Phase 2 SOW on October 12, 2020, and that Elitecom, through its Chief Executive Officer Alan Lin, signed the Phase 2 SOW on October 16, 2020. Elitecom avers that the Phase 2 SOW is "entered into as of the last date executed by the parties," and that by its express terms it is "attached to and made a part of" the parties' Maintenance, Support and License Agreement with an Effective Date of December 23, 2016 (the "Master Agreement"). Elitecom denies all remaining allegations of paragraph

10.

11. Elitecom admits that, under the Phase 2 SOW, it agreed to provide software development turnkey solution services for the ProAV Embedded APP project Phase 2, including design, implementation, and system testing. Elitecom avers that under the same instrument it also agreed to provide continuing maintenance support for both the Phase 1 and Phase 2 scope, and that NETGEAR agreed in exchange to pay a non-recurring engineering ("NRE") fee and an annual maintenance fee for so long as NETGEAR uses the application. Elitecom denies that paragraph 11 accurately or completely describes the parties' obligations and denies all remaining allegations of paragraph 11.

12. Elitecom admits that Section 1.3 of the Phase 2 SOW contains the quoted sentence. Elitecom avers that the quoted sentence is the third of three bullet points under the heading "Project Terms," which NETGEAR omits, and which together provide in full:

> "Both parties reached following project terms: [•] Netgear shall pay Elitecom non-recurring engineering (NRE) fee for the development of this project based on the project development efforts. [•] Netgear shall pay Elitecom an annual project maintenance fee so long as Netgear is using this application. Netgear shall not terminate this project and stop paying the maintenance fee within five years from the GA release of this project. [•] Netgear shall own all source code of this project and related Intellectual Property."

Elitecom denies all remaining allegations of paragraph 12.

13. Elitecom denies the allegations of paragraph 13 as an incomplete and misleading characterization of the Phase 2 SOW, which does not merely

"reference" a fee. Elitecom avers that Section 3 of the Phase 2 SOW provides: "So long as NETGEAR is using this application, NETGEAR shall pay Elitecom a yearly maintenance fee of USD $30,000 in return for Elitecom's support of this project (for both phase 1 and phase 2 scope). The maintenance fee will start at the beginning of 2021. Eliteom [sic] will send invoice to Netgear at beginning of each year starting from 2021."

14. Elitecom admits that the Phase 2 SOW does not state that NETGEAR's ownership of the project source code is conditioned on payment of the maintenance fee. Elitecom denies that this fact has any bearing on NETGEAR's payment obligation, which is a separate and independent covenant triggered by NETGEAR's use of the application, not by the continuation of the "parties' relationship." Elitecom denies all remaining allegations of paragraph 14.

15. Elitecom admits that the Phase 2 SOW does not reserve to Elitecom ownership of the "source code of this project." Elitecom avers that Section 1.3 addresses only the source code of the Phase 2 project and does not address Elitecom's pre-existing tools, libraries, know-how, or other technology not developed under the Phase 2 SOW, as to which Elitecom reserves all rights. Elitecom denies all remaining allegations of paragraph 15.

16. Elitecom admits that it received by email a letter from NETGEAR's General Counsel, Kirsten Daru, dated June 13, 2025 captioned "Notice of Termination of SOW Phase 1 and SOW Phase 2 of the Maintenance, Support and License Agreement," which speaks for itself. Elitecom denies that the letter validly terminated the Phase 2 SOW, the Master Agreement, or NETGEAR's payment obligations. Elitecom avers that (a) the Master Agreement permits termination only for an uncured material breach after thirty days' written notice (Master Agreement § 5.2), and NETGEAR has never identified any breach by Elitecom; (b) the Master Agreement

contains no right to terminate for convenience; (c) Section 1.3 of the Phase 2 SOW expressly prohibits NETGEAR from terminating the project and stopping payment within five years of the GA release; and (d) on information and belief, the letter was not delivered by personal delivery, express courier, or certified or registered mail, return receipt requested, as Section 11.4 of the Master Agreement requires. Elitecom denies all remaining allegations of paragraph 16.

17. Elitecom lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them. Elitecom avers that NETGEAR's allegation that it "transitioned maintenance responsibilities internally" confirms that NETGEAR continued, and continues, to use the application.

18. Elitecom admits that NETGEAR informed Elitecom that its engagement with Elitecom was discontinued as of July 1, 2025, and that NETGEAR thereafter stopped requesting or accepting maintenance and support services from Elitecom. Elitecom denies that it voluntarily ceased performance or abandoned the contract and avers that it was at all relevant times, and remains, ready, willing, and able to provide maintenance and support under the Phase 2 SOW. Elitecom denies all remaining allegations of paragraph 18.

19. Elitecom admits that on or about January 12, 2026, it issued NETGEAR an invoice for the 2026 annual maintenance fee of $30,000, as Section 3 of the Phase 2 SOW directs it to do "at beginning of each year." Elitecom denies that the fee was "additional" or that it was invoiced "nevertheless," and denies all remaining allegations of paragraph 19.

20. Elitecom admits that NETGEAR, through outside counsel at K&L Gates LLP, sent Elitecom a letter dated February 9, 2026 disputing the invoice and declining payment, which letter speaks for itself. Elitecom denies

that NETGEAR's position is correct and denies all remaining allegations of paragraph 20.

21. Elitecom admits that NETGEAR's February 9, 2026 letter quoted the ownership sentence of Section 1.3. Elitecom denies that the ownership sentence relieves NETGEAR of its separate payment obligation and denies all remaining allegations of paragraph 21.

22. Elitecom admits that NETGEAR's February 9, 2026 letter characterized Elitecom's position in the manner alleged. Elitecom denies that characterization. Elitecom avers that the same letter acknowledges that the operative language obligates NETGEAR to pay the annual fee "so long as NETGEAR is using [the] application," and that the letter expressly refused all further payment. Elitecom denies all remaining allegations of paragraph 22.

**Elitecom's Claims and Communications**

23. Elitecom admits that it informed NETGEAR that NETGEAR's continued use of the application requires continued payment of the annual maintenance fee. Elitecom avers that this is what Sections 1.3 and 3 of the Phase 2 SOW say, and denies that its position was "improper." Elitecom denies all remaining allegations of paragraph 23.

24. Elitecom admits that it asked NETGEAR either to pay the invoiced maintenance fee or to confirm in a sworn declaration that NETGEAR had ceased all use of the application and any derivative products. Elitecom avers that the request was reasonable because NETGEAR's payment obligation turns on its use of the application, a fact within NETGEAR's exclusive knowledge, and NETGEAR declined to provide either. Elitecom denies all remaining allegations of paragraph 24.

25. Elitecom admits that its correspondence with NETGEAR stated that Elitecom might inform NETGEAR's customers or licensees of Elitecom's position regarding the parties' agreement, and refers the Court to

that correspondence for its complete contents. Elitecom avers that it has never sent any such communication to any NETGEAR customer or licensee. Elitecom denies NETGEAR's characterization of the correspondence and denies all remaining allegations of paragraph 25.

26. Elitecom admits that it offered to resolve the dispute upon NETGEAR's payment of the maintenance fee owed under the Phase 2 SOW. Elitecom denies that any communication was a threat or was intended to obtain anything other than payment of sums contractually due, and denies all remaining allegations of paragraph 26.

27. Elitecom denies the allegations of paragraph 27.

28. Elitecom denies the allegations of paragraph 28. Elitecom avers that its demand for payment is fully consistent with Section 1.3, which contains both the ownership provision and the continuing payment covenant that NETGEAR omits.

29. Elitecom lacks knowledge or information sufficient to form a belief about the truth of the allegations in this paragraph and, on that basis, denies them. Elitecom admits only that the parties dispute NETGEAR's obligation to pay the annual maintenance fee while it continues to use the application, and specifically denies that Elitecom has harmed or threatened unlawful harm to NETGEAR's customer relationships, goodwill, or business interests.

30. Elitecom admits that an actual and justiciable controversy exists concerning NETGEAR's obligation to pay the annual maintenance fee under the Phase 2 SOW. Elitecom denies all remaining allegations of paragraph 30.

**Count I — Declaratory Judgment**

31. Elitecom incorporates by reference its responses to paragraphs 1 through 30 as though fully set forth herein.

32. Elitecom admits that an actual and justiciable controversy exists

regarding the parties' rights and obligations under the Phase 2 SOW, including NETGEAR's continuing payment obligation. Elitecom denies all remaining allegations of paragraph 32.

33. Elitecom admits that NETGEAR so contends. As to subpart (a), Elitecom admits that Section 1.3 provides that NETGEAR "shall own all source code of this project and related Intellectual Property," and denies that the provision extends to Elitecom's pre-existing technology. Elitecom denies the contentions in subparts (b), (c), (d), and (e), including specifically any contention that NETGEAR may continue to use, maintain, distribute, or license the application without paying the annual maintenance fee. Elitecom denies all remaining allegations of paragraph 33.

34. Elitecom admits that it disputes NETGEAR's position and contends that NETGEAR must continue to pay the annual maintenance fee for so long as NETGEAR uses the application. Elitecom denies NETGEAR's characterization of its contentions and denies all remaining allegations of paragraph 34.

35. Elitecom denies that NETGEAR is entitled to the declarations it seeks. Elitecom avers that NETGEAR's requested declarations would not resolve the parties' actual controversy, which concerns NETGEAR's continuing payment obligation and is properly and fully resolved by Elitecom's Counterclaims below, and that the Court should therefore decline to enter them under 28 U.S.C. § 2201. Elitecom denies all remaining allegations of paragraph 35.

**Response to Prayer for Relief**

Elitecom denies that NETGEAR is entitled to any of the relief requested in Paragraphs A through E of its Prayer for Relief, or to any relief whatsoever, and requests that NETGEAR take nothing by its Complaint.

**Response to Jury Demand**

NETGEAR's jury demand requires no response. Elitecom separately demands a jury on all issues so triable below.

**AFFIRMATIVE DEFENSES**

Without assuming any burden of proof that it would not otherwise bear, Elitecom asserts the following affirmative defenses. Each defense is supported by the specific facts alleged in Elitecom's Counterclaims below, which are incorporated by reference into each defense.

**FIRST AFFIRMATIVE DEFENSE**

**(Prior Material Breach and Repudiation)**

NETGEAR may not obtain a declaration excusing its own nonperformance because NETGEAR materially breached the parties' contracts first. Specifically: (a) on June 13, 2025, NETGEAR purported to terminate the Phase 2 SOW even though the Master Agreement contains no right to terminate for convenience; Section 5.2 permits termination only for a material breach left uncured thirty days after written notice; NETGEAR never identified any breach by Elitecom or gave any notice of breach; and Section 1.3 of the Phase 2 SOW provides that "Netgear shall not terminate this project and stop paying the maintenance fee within five years from the GA release of this project"; (b) the Termination Letter relied on "Sections 5 and 8 and Exhibit B of the Agreement," none of which grants a right to terminate for convenience, misidentified the statement of work it called "SOW 1," and, on information and belief, was not delivered by personal delivery, express courier, or certified or registered mail as Section 11.4 of the Master Agreement requires; (c) NETGEAR failed to pay the $30,000 maintenance fee for 2026 within thirty days of its receipt of Elitecom's January 12, 2026 invoice, as Section 4 of the Phase 2 SOW requires, while continuing to use the Application; and (d) by letter of February 9, 2026, NETGEAR

unequivocally repudiated all future maintenance payments, and it has never retracted that repudiation.

**SECOND AFFIRMATIVE DEFENSE**

**(Prevention of Performance)**

Any cessation of Elitecom's maintenance and support services after June 2025 was caused by NETGEAR. NETGEAR declared Elitecom's engagement "fully discontinued as of July 1, 2025," transitioned maintenance of the application in-house, and stopped submitting support requests, while Elitecom remained ready, willing, and able to perform. Under California Civil Code sections 1511 and 1512, Elitecom's performance is excused, and because NETGEAR prevented that performance, Elitecom is entitled to all the benefits it would have obtained had both parties performed, including the annual maintenance fee. NETGEAR cannot rely on the absence of Elitecom's services, which NETGEAR itself refused, to avoid payment.

**THIRD AFFIRMATIVE DEFENSE**

**(Estoppel)**

NETGEAR is estopped from asserting that its payment obligation ended upon its purported termination or that its ownership of the project source code excuses payment. NETGEAR negotiated the maintenance-fee terms before signing the Phase 2 SOW; its revision history records that the "Maintenance Fee" section was modified on September 30, 2020 "after meeting with NTGR." NETGEAR's Vice President of CBU Engineering then signed the Phase 2 SOW on October 12, 2020, agreeing that the new $30,000 fee "shall replace the maintenance fee term defined in the ProAV Phase 1 SOW." NETGEAR paid NRE fees of $112,000 for Phase 1 and $58,000 for Phase 2. NETGEAR owned the project source code throughout, yet paid the annual maintenance fee upon Elitecom's invoice for each year from 2021 through 2025 without ever asserting that the fee was optional, terminable at

will, tied to the term of the Master Agreement, or excused by ownership. Elitecom relied on that conduct by continuing to dedicate engineering personnel and resources to supporting the Application for both the Phase 1 and Phase 2 scope.

**FOURTH AFFIRMATIVE DEFENSE**

**(Waiver)**

By the conduct described in the preceding defense, including five consecutive years of payment while owning the project source code, NETGEAR intentionally relinquished any contention that its ownership of the source code relieves it of the annual maintenance fee or that the fee could be ended at NETGEAR's election while it continued to use the application.

**FIFTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

NETGEAR's request for declaratory relief is barred or limited by its unclean hands, which relate directly to the relief sought. NETGEAR asks the Court to declare that it may continue "using, maintaining, distributing, and licensing" the Application (Compl., Prayer B) while refusing to pay the fee it promised for exactly that use. NETGEAR's Complaint quotes the ownership sentence of Section 1.3 but omits the payment covenant that immediately precedes it in the same section; describes the maintenance fee merely as "referenced" in the Phase 2 SOW (Compl. ¶ 13) when Section 3 is an express promise to pay; and does not attach the Phase 2 SOW, the Phase 1 SOW, the Master Agreement, or the Termination Letter. NETGEAR thereby sought declaratory relief on an incomplete presentation of the very contract it asks the Court to construe.

**SIXTH AFFIRMATIVE DEFENSE**

**(Privilege and Justification)**

Each communication of which NETGEAR complains in paragraphs 23

through 28 of the Complaint was a good-faith demand for payment of sums due under a written contract, made in contemplation of litigation and directed to NETGEAR and its counsel. Those communications are privileged under California Civil Code section 47(b) and justified as a good-faith assertion of Elitecom's contractual rights, and they cannot support NETGEAR's requested declaration that Elitecom lacks a "lawful basis" for its position (Compl., Prayer C). Elitecom has not sent any communication to any NETGEAR customer or licensee.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Setoff and Recoupment)**

Any relief awarded to NETGEAR, including any award of attorneys' fees or costs, must be offset by and recouped against the sums NETGEAR owes Elitecom under the same contracts, including the unpaid 2026 maintenance fee, all subsequently accruing annual maintenance fees, interest, attorneys' fees, and costs.

**COUNTERCLAIMS**

Counterclaimant Elitecom Technologies Corporation ("Elitecom") alleges as follows against Counterdefendant NETGEAR, Inc. ("NETGEAR"):

**NATURE OF THE COUNTERCLAIMS**

1. NETGEAR hired Elitecom to design, build, and maintain the embedded web graphical user interface application (the "Application") that runs on NETGEAR's ProAV line of managed network switches, including the M4250 and M4300 series. In exchange, NETGEAR made two separate promises in the same section of the same contract: it would own "all source code of this project," and it would "pay Elitecom an annual project maintenance fee so long as Netgear is using this application."

2. NETGEAR has received the first promise and is refusing to

honor the second. It continues to use, maintain, and distribute the Application, but it has stopped paying for it. Elitecom brings these Counterclaims to recover the annual maintenance fees NETGEAR owes and has repudiated, in an amount of not less than $120,000, together with interest, attorneys' fees, and costs, and to obtain a declaration that NETGEAR must continue to pay for so long as it continues to use the Application.

## PARTIES

3. Counterclaimant Elitecom Technologies Corporation is a software development company organized under the laws of the People's Republic of China, with its principal place of business at 999 Zhongshan West Road, Suite 313, Shanghai, China 200051. Its Chief Executive Officer is Alan Lin.

4. Counterdefendant NETGEAR, Inc. is, on information and belief, a Delaware corporation with its principal place of business at 350 East Plumeria Drive, San Jose, California 95134.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over these Counterclaims under 28 U.S.C. § 1332(a)(2) because Elitecom is a citizen of a foreign state, NETGEAR is a citizen of Delaware and California, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) because these Counterclaims arise out of the same transactions and occurrences that are the subject of NETGEAR's Complaint. The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

6. These Counterclaims are compulsory counterclaims under Federal Rule of Civil Procedure 13(a).

7. The Court has personal jurisdiction over NETGEAR, which maintains its principal place of business in this District and filed this action

here.

8. Venue is proper in this District under 28 U.S.C. § 1391(b) because NETGEAR resides in this District and chose this forum by filing this action.

## FACTUAL ALLEGATIONS

### A. The Master Agreement

9. On or about December 22–23, 2016, Elitecom and NETGEAR entered into a written Maintenance, Support and License Agreement (the "Master Agreement"), with an Effective Date of December 23, 2016, signed for Elitecom by its Chief Executive Officer, Alan Lin, and for NETGEAR by Rex Pugh, Director of Engineering, CBU.

10. Section 5.1 of the Master Agreement provides for an initial two-year term that automatically renews for additional one-year terms unless a party gives written notice of non-renewal at least sixty days before the renewal date.

11. Section 5.2 of the Master Agreement permits a party to terminate only "for the material breach of the other party, which material breach is curable and has remained uncured for a period of thirty (30) days from the date of delivery of written notice thereof to the breaching party." The Master Agreement contains no provision permitting either party to terminate for convenience.

12. Exhibit B to the Master Agreement provides that NETGEAR may add new device support or new features, for which "NETGEAR shall pay extra fees based on the efforts the specific work involved," and that a new statement of work "shall be signed by both parties as addendum of this agreement."

13. Section 11.1 of the Master Agreement provides that it is governed by the laws of the United States and the State of California.

14. Section 11.2 of the Master Agreement provides: "In the event any proceeding or lawsuit is brought by Licensor or NETGEAR in connection with this Agreement, the prevailing party in such proceeding shall be entitled to receive its costs, expert witness fees and reasonable attorneys' fees, including costs and fees on appeal." Under Section 11.11, Section 11 "shall survive any expiration or termination of the Agreement."

15. Section 11.4 of the Master Agreement requires that all notices "be delivered by personal delivery, by recognized express courier (e.g., FedEx or UPS) providing proof of delivery, or by certified or registered mail, return receipt requested."

**B. The ProAV Phase 1 SOW**

16. In February 2020, the parties executed a Statement of Work titled "ProAV Embedded APP Project" (the "Phase 1 SOW"), signed for NETGEAR by Ye Zhang, Vice President of CBU Engineering, on February 18, 2020, and for Elitecom by Alan Lin on February 20, 2020. The Phase 1 SOW is expressly "attached to and made a part of" the Master Agreement.

17. Under the Phase 1 SOW, Elitecom agreed to develop the Application for NETGEAR's ProAV M4300 and M4250 switch models. NETGEAR agreed to pay a non-recurring engineering ("NRE") fee of $112,000 and, "[s]o long as NETGEAR is using this application," a yearly maintenance fee of $23,000. The Phase 1 SOW also provided that NETGEAR "shall not terminate this project and stop paying the maintenance fee within five years from the GA release of this project."

18. Elitecom completed and delivered the Phase 1 Application, which reached general availability ("GA") release on August 9, 2020, as NETGEAR acknowledged in the Phase 2 SOW.

**C. The ProAV Phase 2 SOW**

19. In September 2020, the parties negotiated a second Statement of

Work titled "ProAV Embedded APP Project Phase 2" (the "Phase 2 SOW"). Its revision history records that version 1.2, dated September 30, 2020, "Modified 'Maintenance Fee' section after meeting with NTGR." NETGEAR specifically negotiated the maintenance-fee terms before signing.

20. NETGEAR, through Fanny Lu, its Vice President of CBU Engineering, signed the Phase 2 SOW on October 12, 2020. Elitecom, through Alan Lin, signed it on October 16, 2020. The Phase 2 SOW is "attached to and made a part of" the Master Agreement and provides that "[t]o the extent that this Statement of Work is inconsistent with or conflicts with the Agreement, this Statement of Work shall control."

21. Under the Phase 2 SOW, Elitecom agreed to resolve outstanding issues from Phase 1 and to deliver LAG, PoE, Security, Maintenance, and Diagnostics functions across NETGEAR's M4250 series (Lion King and Iron Man) and M4300 series switches, with GA release scheduled for December 31, 2020.

22. Section 1.3 of the Phase 2 SOW, titled "Project Terms," provides in full:

> "Both parties reached following project terms: [•] Netgear shall pay Elitecom non-recurring engineering (NRE) fee for the development of this project based on the project development efforts. [•] Netgear shall pay Elitecom an annual project maintenance fee so long as Netgear is using this application. Netgear shall not terminate this project and stop paying the maintenance fee within five years from the GA release of this project. [•] Netgear shall own all source code of this project and related Intellectual Property."

23. Section 2 of the Phase 2 SOW obligated NETGEAR to pay an

additional NRE fee of $58,000.

24. Section 3 of the Phase 2 SOW, titled "Maintenance Fee," provides: "So long as NETGEAR is using this application, NETGEAR shall pay Elitecom a yearly maintenance fee of USD $30,000 in return for Elitecom's support of this project (for both phase 1 and phase 2 scope). The maintenance fee will start at the beginning of 2021. Eliteom [sic] will send invoice to Netgear at beginning of each year starting from 2021." Section 3 further provides that "[t]his maintenance fee term shall replace the maintenance fee term defined in the ProAV Phase 1 SOW."

25. When the parties replaced the Phase 1 fee with the $30,000 fee covering both phases, they carried forward the same continued-use trigger. Both the Phase 1 SOW and the Phase 2 SOW condition the annual maintenance fee on NETGEAR's use of the Application, and both prohibit NETGEAR from terminating the project and stopping payment within five years of the GA release. NETGEAR agreed to that structure twice.

26. Section 4 of the Phase 2 SOW provides that "[p]ayment shall be made by NETGEAR to Elitecom within 30 days of receipt of invoice by NETGEAR," and that "[a]ll payments and amounts shall be paid without deduction, set-off or counter claim, free and clear of any restrictions or conditions."

### D. Elitecom Performs, and NETGEAR Pays for Five Years

27. Elitecom fully performed its development obligations under both SOWs. It delivered the Phase 1 Application at GA on August 9, 2020, and delivered the Phase 2 functions for GA release on or about December 31, 2020.

28. From 2021 through June 2025, Elitecom provided maintenance and support for the Application, including bug fixes and minor user-interface and feature enhancements, as Section 3 of the Phase 2 SOW contemplates.

29. NETGEAR paid both NRE fees, and it paid the $30,000 annual maintenance fee upon Elitecom's invoice for each calendar year from 2021 through 2025. Throughout that period NETGEAR owned the project source code, and at no time did NETGEAR assert that its ownership excused payment, that the fee was optional, or that the fee could be ended at will.

**E. NETGEAR's Purported Termination**

30. By letter dated June 13, 2025, sent by email and signed by its General Counsel, Kirsten Daru, NETGEAR purported to give "notice of termination" of the "AV UI projects," including the Phase 2 SOW (the "Termination Letter"). The Termination Letter stated that it was provided "according to Sections 5 and 8 and Exhibit B of the Agreement, Section 3 of SOW 1, and Sections 1 and 3 of SOW 2."

31. None of the provisions cited in the Termination Letter authorizes NETGEAR to terminate for convenience, and none authorizes NETGEAR to stop paying the maintenance fee while it continues to use the Application.

32. The Termination Letter identified no breach by Elitecom. NETGEAR never gave Elitecom notice of any breach or an opportunity to cure under Section 5.2 of the Master Agreement. Elitecom was not in breach.

33. The Termination Letter was sent before the fifth anniversary of the Phase 2 GA release, contrary to Section 1.3's covenant that NETGEAR "shall not terminate this project and stop paying the maintenance fee within five years from the GA release of this project." On information and belief, it also was not delivered by any method that Section 11.4 of the Master Agreement requires.

34. NETGEAR later stated, through counsel, that its engagement with Elitecom was "fully discontinued as of July 1, 2025," and that "NETGEAR thereafter transitioned any maintenance responsibilities in-house." After July 1, 2025, NETGEAR stopped submitting maintenance and

support requests to Elitecom. Elitecom was at all times, and remains, ready, willing, and able to provide maintenance and support under the Phase 2 SOW.

**F. NETGEAR Continues to Use the Application**

35. NETGEAR has continued, and continues, to use the Application after its purported termination, as its own statements confirm. NETGEAR's February 9, 2026 letter states that NETGEAR "transitioned any maintenance responsibilities in-house," which would be unnecessary for software NETGEAR no longer used. NETGEAR's Complaint alleges that it "transitioned maintenance responsibilities internally" (Compl. ¶ 17) and asks the Court to declare that NETGEAR "may continue using, maintaining, distributing, and licensing the software and related intellectual property" (Compl., Prayer B). Neither NETGEAR's letter nor its Complaint denies that NETGEAR continues to use the Application.

36. On information and belief, NETGEAR continues to sell, ship, distribute, support, and license ProAV M4250 and M4300 series switches running firmware that incorporates the Application, and continues to make firmware updates incorporating the Application available to its customers.

**G. The 2026 Invoice and NETGEAR's Repudiation**

37. On or about January 12, 2026, as Section 3 of the Phase 2 SOW directs, Elitecom invoiced NETGEAR $30,000 for the 2026 annual maintenance fee. Under Section 4, payment was due within thirty days of NETGEAR's receipt of the invoice, or on or about February 11, 2026.

38. By letter dated February 9, 2026, NETGEAR's outside counsel stated that NETGEAR "declines to provide payment on the January 12, 2026 invoice" and that "NETGEAR does not owe Elitecom any further maintenance fees." The letter acknowledged that Elitecom's claim rests on the obligation to pay "so long as NETGEAR is using [the] application."

39. Elitecom then asked NETGEAR either to pay the invoice or to

confirm by sworn declaration that NETGEAR had ceased all use of the Application and any derivative products. NETGEAR did neither. Instead, on June 4, 2026, it filed this action.

40. NETGEAR has not paid any part of the 2026 maintenance fee and has unequivocally stated that it will not pay any future maintenance fee. NETGEAR has never retracted that repudiation.

**H. The Legal Issue: Why NETGEAR Still Owes the Fee**

41. This dispute turns on one question of contract interpretation: does NETGEAR's obligation to pay $30,000 per year "so long as NETGEAR is using this application" end when NETGEAR stops accepting Elitecom's support, or does it continue for as long as NETGEAR keeps using the Application? The contract answers that question, for six independent reasons.

42. First, the payment trigger is use. Sections 1.3 and 3 of the Phase 2 SOW both condition the fee on one fact, NETGEAR's use of the Application, and nothing else. Neither section ties the fee to the term of the Master Agreement, to the continuation of a service relationship, or to NETGEAR's decision whether to request support. Under California law, the clear and explicit language of a contract governs. Cal. Civ. Code §§ 1638, 1639.

43. Second, ownership and payment are separate promises. Section 1.3 lists the NRE fee, the annual maintenance fee, and NETGEAR's ownership of the source code as three distinct "project terms." None is conditioned on another. NETGEAR owned the source code from 2021 through 2025 and paid the fee every one of those years, which confirms that ownership was never understood to excuse payment. The contract must be read as a whole, giving effect to every part. Cal. Civ. Code § 1641.

44. Third, NETGEAR had no right to end its payment obligation by "termination." The Master Agreement permits termination only for an

uncured material breach, and NETGEAR identified none. Section 1.3 separately bars NETGEAR from terminating the project and stopping payment within five years of GA. And even if NETGEAR could end the service relationship, doing so would not end an obligation that, by its express terms, continues for so long as NETGEAR uses the Application.

45. Fourth, the Master Agreement does not override the Phase 2 SOW. To the extent NETGEAR relies on Exhibit B to the Master Agreement, which makes the quarterly fees for the separately licensed NMS300 technology payable while that Agreement "is in effect," the Phase 2 SOW expressly provides that it "shall control" over any inconsistent term of the Master Agreement. The Phase 2 SOW's specific, project-level payment term keyed to use therefore governs. See Cal. Code Civ. Proc. § 1859.

46. Fifth, NETGEAR cannot avoid payment by refusing the services it is paying for. NETGEAR, not Elitecom, discontinued Elitecom's engagement and moved maintenance in-house. Where the creditor prevents performance, the debtor's performance is excused and the debtor "is entitled to all the benefits which he would have obtained if it had been performed by both parties." Cal. Civ. Code §§ 1511, 1512.

47. Sixth, NETGEAR's own conduct confirms Elitecom's reading. NETGEAR negotiated the maintenance-fee language before signing, paid it for five consecutive years, quoted the "so long as NETGEAR is using" language in its own February 9, 2026 letter without denying continued use, and now asks this Court for permission to keep using the Application. NETGEAR's course of performance is strong evidence of the parties' intended meaning. Cal. Civ. Code § 1647.

**I. Elitecom's Damages**

48. As a direct and proximate result of NETGEAR's breach and repudiation, Elitecom has been damaged in an amount of not less than

$120,000, consisting of (a) the $30,000 maintenance fee for calendar year 2026, which is past due; and (b) $90,000 in annual maintenance fees for calendar years 2027, 2028, and 2029, which NETGEAR has repudiated and which will come due during NETGEAR's continued use of the Application. On information and belief, NETGEAR's use of the Application will continue at least through 2029 because the ProAV M4250 and M4300 product lines that incorporate it remain in active distribution and support. Elitecom's damages continue to accrue at $30,000 for each additional calendar year in which NETGEAR uses the Application.

**FIRST COUNTERCLAIM**

**(Breach of Written Contract, Including Anticipatory Repudiation — Against NETGEAR)**

49. Elitecom incorporates by reference paragraphs 1 through 48 of these Counterclaims as though fully set forth herein.

50. The Master Agreement, the Phase 1 SOW, and the Phase 2 SOW are valid and enforceable written contracts supported by adequate consideration.

51. Elitecom performed all conditions, covenants, and promises required of it, except those whose performance was excused or prevented by NETGEAR, including by NETGEAR's discontinuance of Elitecom's engagement as of July 1, 2025 and its refusal thereafter to request or accept Elitecom's support. Cal. Civ. Code §§ 1511, 1512.

52. All conditions to NETGEAR's obligation to pay the 2026 maintenance fee occurred or were excused: NETGEAR used the Application in 2026, and Elitecom invoiced the fee at the beginning of the year as Section 3 requires.

53. NETGEAR breached Sections 1.3, 3, and 4 of the Phase 2 SOW by failing to pay the $30,000 annual maintenance fee for 2026 within thirty

days of its receipt of Elitecom's January 12, 2026 invoice, while continuing to use the Application.

54. NETGEAR also breached Section 1.3 of the Phase 2 SOW by purporting to terminate the project before the fifth anniversary of its GA release, and breached the Master Agreement by purporting to terminate without cause, without notice of breach or opportunity to cure, and without complying with Section 11.4.

55. The Phase 2 SOW is a bilateral contract under which both parties had continuing obligations: NETGEAR to pay the annual fee for so long as it uses the Application, and Elitecom to provide maintenance and support in return. By its February 9, 2026 letter and by filing this action, NETGEAR clearly, positively, and unequivocally repudiated its obligation to pay all future annual maintenance fees, and it has never retracted that repudiation. Under California Civil Code section 1440, Elitecom may enforce NETGEAR's obligation without first performing or offering to perform, and may treat the repudiation as a total breach and recover now the damages caused by the loss of the future payments. At the time of the repudiation, Elitecom was ready, willing, and able to perform.

56. As a direct and proximate result of NETGEAR's breaches and repudiation, Elitecom has been damaged in an amount to be proven at trial, but not less than $120,000.

57. Elitecom's damages are certain or capable of being made certain by calculation, and Elitecom is entitled to prejudgment interest at ten percent per annum from the date each payment became due. Cal. Civ. Code §§ 3287(a), 3289(b).

58. Elitecom is entitled to recover its reasonable attorneys' fees, expert witness fees, and costs under Section 11.2 of the Master Agreement, which applies because the Phase 2 SOW is "attached to and made a part of"

the Master Agreement and this lawsuit was brought "in connection with" it, and under California Civil Code section 1717.

**SECOND COUNTERCLAIM**

**(Declaratory Judgment, 28 U.S.C. §§ 2201–2202 — Against NETGEAR)**

59. Elitecom incorporates by reference paragraphs 1 through 58 of these Counterclaims as though fully set forth herein.

60. An actual, substantial, and justiciable controversy exists between Elitecom and NETGEAR concerning NETGEAR's continuing obligation to pay the annual maintenance fee. NETGEAR contends that it owes no further fees and may continue to use, maintain, distribute, and license the Application without payment. Elitecom contends that NETGEAR must pay $30,000 for each calendar year in which it uses the Application. The controversy is immediate and real because the fee accrues annually, NETGEAR has repudiated every future installment, and NETGEAR's Complaint does not seek a declaration on that payment question in its Prayer for Relief.

61. Elitecom seeks a declaration that:

(a) NETGEAR's obligation under Sections 1.3 and 3 of the Phase 2 SOW to pay Elitecom a yearly maintenance fee of $30,000 continues for each calendar year in which NETGEAR uses the Application, notwithstanding NETGEAR's June 13, 2025 Termination Letter or the status of the Master Agreement;

(b) NETGEAR's ownership of "all source code of this project and related Intellectual Property" under Section 1.3 of the Phase 2 SOW does not discharge, limit, or condition its separate obligation to pay the annual maintenance fee; and

(c) Section 1.3 of the Phase 2 SOW does not convey to NETGEAR any ownership interest in Elitecom's pre-existing tools, libraries, or other technology not developed under the Phase 2 SOW.

62. Elitecom does not seek, by this Counterclaim, a declaration that ownership of the source code developed under the Phase 2 SOW has reverted to Elitecom.

63. The requested declaration will serve a useful purpose in settling the parties' legal relations and will terminate the uncertainty giving rise to this proceeding, including as to fees that will accrue in future years. Under 28 U.S.C. § 2202, Elitecom is also entitled to further necessary or proper relief based on the declaration, including an award of all maintenance fees that come due during the pendency of this action, together with its reasonable attorneys' fees and costs under Section 11.2 of the Master Agreement and California Civil Code section 1717.

**PRAYER FOR RELIEF**

WHEREFORE, Elitecom prays for judgment against NETGEAR as follows:

On NETGEAR's Complaint:

1. That NETGEAR take nothing by its Complaint, and that judgment be entered in Elitecom's favor;
2. That the Court deny each of the declarations requested in NETGEAR's Prayer for Relief;

On Elitecom's Counterclaims:

3. For compensatory damages in an amount to be proven at trial, but not less than $120,000, consisting of the past-due 2026 annual maintenance fee of $30,000 and the repudiated annual maintenance fees for 2027 through 2029, together with all additional annual maintenance fees that accrue during NETGEAR's continued use of the Application;
4. For the declarations set forth in the Second Counterclaim;
5. For further necessary or proper relief under 28 U.S.C. § 2202, including an award of all annual maintenance fees that accrue

during the pendency of this action;

6. For prejudgment interest at ten percent per annum from the date each payment became due, under California Civil Code sections 3287 and 3289;

7. For post-judgment interest under 28 U.S.C. § 1961;

8. For a determination that Elitecom is the prevailing party, and for an award of its reasonable attorneys' fees, expert witness fees, and costs, including on appeal, under Section 11.2 of the Master Agreement and California Civil Code section 1717;

9. For costs of suit under Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1920; and

10. For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b) and Civil Local Rule 3-6, Elitecom demands a trial by jury on all issues and claims so triable, including all issues raised by NETGEAR's Complaint and by Elitecom's Counterclaims.

Dated: November 19, 2026

LAW OFFICES OF STEVEN C. VONDRAN, P.C.

By: /s/ Steven C. Vondran
Steven C. Vondran
Attorneys for Defendant and Counterclaimant ELITECOM TECHNOLOGIES CORPORATION

**PROOF OF SERVICE**

I, Steven C. Vondran, declare that I am over the age of eighteen years and not a party to this action. My business address is One Sansome Street, Suite 3500, San Francisco, California 94104.

On November 19, 2026, I electronically filed the foregoing DEFENDANT ELITECOM TECHNOLOGIES CORPORATION'S ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS; DEMAND FOR JURY TRIAL with the Clerk of the Court for the United States District Court for the Northern District of California, Case No. 5:26-cv-05417-SVK, using the Court's CM/ECF system.

Counsel of record for Plaintiff and Counterdefendant NETGEAR, Inc. are registered CM/ECF users and were served electronically through the Court's CM/ECF system by Notice of Electronic Filing pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) and Civil Local Rule 5-1, as follows:

Jason N. Haycock (Jason.Haycock@klgates.com)
K. Taylor Yamahata (Taylor.Yamahata@klgates.com)
K&L GATES LLP
Four Embarcadero Center, Suite 1200
San Francisco, California 94111

I also sent a courtesy copy by email to Morgan T. Nickerson, K&L Gates LLP, One Congress Street, Suite 2900, Boston, Massachusetts 02114 (Morgan.Nickerson@klgates.com).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 19, 2026, at San Francisco, California.

/s/ Steven C. Vondran
Steven C. Vondran